UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL CABRERA,

           Petitioner,

    v.

NEIL MCDOWELL, Warden,

           Respondent.

Case No.  14-cv-02494-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Miguel Cabrera,[1] a state prisoner currently incarcerated at Ironwood State Prison, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2011 conviction and sentence rendered in the Santa Clara County Superior Court involving sexual offenses against his step-daughter, Jane Doe.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES all claims in the amended petition for the reasons set forth below.

**I.      FACTUAL BACKGROUND**

The California Court of Appeal described the relevant facts as follows:

> *The Prosecution's Case*
> Jane Doe is Petitioner's stepdaughter.[FN 4]   Petitioner married Jane's mother when Jane was seven years old.  In November 2010, Jane was 17 years old.
>
> [FN 4:]  We refer to the victim in this case as Jane or Jane Doe to protect her anonymity.
>
> On November 19, 2010, Jane went to the Gilroy Police Department after she ran away from home.  Officer John Ballard testified that when he interviewed Jane on November 19, she appeared to be "shaken up" and was withdrawn and quiet.  Jane told Officer Ballard that she had been molested by her stepfather starting when she was eight or nine years old.  Petitioner started by rubbing her breast and vagina on almost a daily basis until she was 13 years old and started menstruating.   At that time, Petitioner started having intercourse with her; however, prior to intercourse Petitioner would lick Jane's vagina, rub her and then have intercourse.  Jane estimated that this happened at least 15 times when she was 13 and continued until she was 17.  Jane told Officer Ballard that Petitioner forced her, other

---

[1] Petitioner is also known as Mario Dias Bariga.  CT 149.

United States District Court
Northern District of California

times she would "just go along with it for fear of getting hit." Jane said that Petitioner had slapped her in the past.[FN 5]

[FN 5:] During Jane's trial testimony, after she identified her own voice, a recording of Jane's interview with Detective Ballard was played for the jury and moved into evidence.

Officer Ballard had Jane make a pretext telephone call to Petitioner. During the telephone call Jane told Petitioner that she thought she might be pregnant and that it was by him. After a pause, Petitioner responded, "No, no, no, no." Petitioner did not admit or deny the implication that he had had sexual intercourse with Jane.[FN 6]

[FN 6:] A recording of the pretext telephone conversation was played for the jury.

Officer Ballard interviewed Petitioner on the night of November 19 at the Gilroy Police Station. Initially, Petitioner denied that he had sexually molested Jane. However, after the officer used a ruse—he asked Petitioner why his DNA would have been found inside Jane— Petitioner told the officer that a month earlier Jane "came on to him" and they had consensual sex until he realized that it was wrong and he stopped. Officer Del Moral testified that during the interview Petitioner appeared calm and was cooperative; Petitioner even laughed a couple of times.[FN 7]

[FN 7:] Portions of the video recording of Petitioner's interview were played for the jury during Jane's trial testimony.

Gilroy Police Corporal Rosa Quinones interviewed Jane initially. Jane told her that Petitioner started sexually molesting her when she was eight or nine years old. Petitioner touched her vagina until she turned 13 and then he started having intercourse with her. Jane told her that she did not want to have intercourse with Petitioner; she did not like it. On one occasion, Petitioner slapped her because she said no, but he had intercourse with her anyway.

At trial, Jane testified that Petitioner never touched her inappropriately. She admitted that in November 2010, she said that Petitioner had sexually molested her. She acknowledged that on the day after she ran away she told her friend and her boyfriend that she had suffered sexual abuse since she was seven or eight. However, she testified that she made up the story because she wanted her freedom and was mad at Petitioner for taking away her cellular telephone. Jane admitted that she told the police that Petitioner had sexually abused her for years. In addition, she acknowledged that she feared if she told anyone what had happened Petitioner would be locked up, her mother would lose her husband and her family would lose Petitioner's financial support.

Jane listened to Petitioner's statement to the police where he admitted that he put his penis into Jane's vagina before he realized that it was wrong. Jane continued to deny that anything had happened. On cross examination Jane said that the first time she said that the accusations were false was when she testified at the preliminary hearing held on July 8, 2011, but she told her social

worker that she had made up the accusations before then.  Jane said that she needed help to stop lying.

During her testimony, Jane stated that Petitioner would beat her if she did not listen; this started when she was about eight years old. Petitioner would use a looped belt to hit her on her behind or sometimes her back or legs.  Jane said that Petitioner had only slapped her once by accident.  Jane denied that Petitioner had slapped her about two weeks before she ran away, but acknowledged that was what she had told the police.  Jane said that she had tried to run away before, but Petitioner and her mother would always stop her from leaving.

Jane's mother testified that Jane ran away from home on November 18, 2010, after an argument about doing chores.  The following day, Jane's mother reported her missing to the police.  According to Jane's mother, before Jane ran away, her daughter never told her that anything inappropriate had happened between her and Petitioner.  Jane's mother did not believe that the accusations were true.  She said that Jane was a liar and although Jane was strong-willed, she believed that someone pushed Jane into making false accusations.  Jane's mother stated that even if Petitioner had admitted that he had sex with Jane and touched her breasts, she would still believe that Jane was a liar.  Jane's mother said that Jane never appeared to be afraid of Petitioner.  Jane was expected to do a large amount of chores.  However, as she got older she began to resist doing them.  Jane began to complain that her parents did not let her go out with her friends; Jane would often lie to escape her responsibilities or to avoid punishment.

Jane's mother testified that on November 18, 2010, Jane refused to do her cleaning chores.  Consequently, Petitioner instructed her to take away Jane's cellular telephone.  Initially, Jane refused to give up the telephone, but eventually she threw it or handed it angrily to her.  Then, Jane began to clean the bathroom and kitchen.  When she was done, Jane was still angry, which caused her three year old sister to cry.  Petitioner told Jane to go to the living room.  Instead, Jane left the house.

Jane's mother and Petitioner knew that Jane was dating a boy who was 17 years old.  They retrieved his telephone number from Jane's telephone and went to his house to look for her.

Jane's boyfriend testified that on November 19 he met with Jane and she told him she had run away from home because of something that had happened with her stepfather.  Jane said that her stepfather had raped her and it started around the time she was 13 years old.  Jane's boyfriend testified that it was his father that took Jane to the Gilroy Police Station.

As noted, a recording of Jane's interview was played for the jury.  In the interview Jane told the police that Petitioner would touch her vagina on almost a daily basis until she was 13.  After she was 13, Petitioner started having intercourse with her at least twice a week; she described a routine that occurred every time Petitioner had intercourse with her.  The incidents would occur when her mother

was not home.  Petitioner would call her over, start touching her breasts and vagina and then take off her clothes; Petitioner would orally copulate her almost every time they had intercourse.  After he took off her clothes, Petitioner would make her lie down, then, he would take off his clothes, get on top of her, start kissing her, and have intercourse with her.   Sometimes Petitioner would use a condom, but sometimes not.  Petitioner assured her that if she ever became pregnant he would "take care of it."   Jane said that sometimes she would say no, but Petitioner would still make her do it.   Sometimes he would stop talking to her for days.   The last incident happened about two weeks before she left.  She had told Petitioner "no" and he had slapped her.  Jane acknowledged that despite her telling Petitioner to stop, Petitioner thought she liked it.

Carl Lewis testified as an expert on [Child Sexual Abuse Accommodation Syndrome or] CSAAS that victims of child sexual abuse often delay in reporting the abuse out of fear of the outcome.[FN 8]  Specifically, the child is afraid of what will happen if she tells anyone what has happened including such things as the break-up of her family and anger or violence from the abuser.  Child victims of sexual abuse often retract their accusations.  This is so because the child finds herself in a great deal of chaos after the accusation is made and so the child retracts the accusation in order to make things better or make them return to normal.  As a result of CSAAS, the victim's claim should not be rejected outright because it seems illogical or unbelievable.  Rather it should be accepted and investigated thoroughly; there should be no preconceived ideas about how children react to sexual abuse.

[FN 8:] Before trial the court limited Lewis's testimony to the issues of recantation and delayed reporting.

*Defense Testimony*
Doctor Annette Ermshar testified as an expert for the defense that CSAAS was designed for doctors, psychologists and therapists to treat children and not to interrogate the child.  CSAAS is not helpful in determining which children have been sexually abused and which children have not.  Both groups may exhibit the same behavior and sexually abused children may not exhibit any of the CSAAS behavior.   CSAAS is not currently accepted by the scientific community because it does not provide any useful information.  On cross examination Doctor Ermshar acknowledged that some children who have been sexually abused delay reporting the abuse, adapt and survive in that environment and later retract their claim of abuse.

*People v. Cabrera*, No. H037730, 2013 WL 5348082, *2-4 (Cal. Ct. App. Sept. 25, 2013)

(footnotes in original and brackets added).

## II.   PROCEDURAL BACKGROUND

On July 15, 2011, the Santa Clara County District Attorney filed an information in which Petitioner was charged with three counts of aggravated sexual assault on a child under 14 years of

United States District Court
Northern District of California

age pursuant to California Penal Code § 269 (counts one through three)[2]; six counts of lewd or lascivious acts upon a child by force, violence, duress, menace or fear or "forcible lewd acts" pursuant to California Penal Code § 288(b)(1) (counts four through nine); and four counts of rape by force, violence, duress, menace or fear pursuant to California Penal Code § 261(a)(2), (counts 10 through 13).  1CT 149-158.[3]

On October 31, 2011, following approximately three days of trial testimony, the jury found Petitioner not guilty of counts two and four, and guilty on all the remaining counts.  2CT 358-362.

On December 5, 2011, the trial court imposed a determinate prison term of 54 years (full term consecutive sentences for counts five through 13) and a consecutive indeterminate term of 30 years to life (15 years to life for both counts one and three).  2CT 391-396.

On December 14, 2011, Petitioner appealed the judgment to the California Court of Appeal.  2CT 397.  On appeal, Petitioner raised seven issues.  *Cabrera*, 2013 WL 5348082, *1. First, Petitioner challenged the sufficiency of the evidence of force as it pertains to counts five through nine—forcible lewd acts with a child under the age of 14.  *Id.*  Second, Petitioner contended that all the counts involving force—counts four through nine (forcible lewd acts), count one (aggravated sexual assault based on forcible rape) and counts 10 through 13 (forcible rape) must be reversed because the trial court failed to instruct on lesser included offenses.  *Id.*  Third, Petitioner argued that the trial court erred by failing to instruct the jury on how to consider circumstantial evidence of facts other than his mental state.  *Id.*  Fourth, Petitioner claimed the trial court erred in admitting evidence of CSAAS[4] because there was no evidence that the jurors needed to be disabused of any misconceptions; and by instructing the jurors that they could use the

---

[2] The three counts of aggravated sexual assault were based on allegations of forcible rape in count one, forcible penetration with a foreign object in count two, and forcible oral copulation in count three.

[3] In the information, the district attorney referred to Petitioner using his alias, Mario Dias Bariga.

[4] CSAAS "describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse."  *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003).

1  testimony in considering the victim's testimony.  *Id.*  Fifth, Petitioner argued that considered

2  cumulatively all the foregoing errors violated his right to a fair trial.  *Id.*  Sixth, Petitioner alleged

3  the trial court violated his Sixth Amendment right to counsel when it failed to conduct a *Marsden*[5]

4  hearing.  *Id.*  Finally, Petitioner contended that the trial court erred by imposing consecutive

5  sentences for counts one and three.  *Id.*

6         On August 9, 2013, Petitioner also filed a state habeas petition in the California Court of

7  Appeal, alleging claims of ineffective assistance of counsel ("IAC").  *In re Miguel Cabrera on*

8  *Habeas Corpus*, Case No. H040001 (Aug. 9, 2013); Dkt. 9 at 2.  In his state habeas petition,

9  Petitioner argued that he was deprived of the effective assistance of counsel because his trial

10  counsel failed to move to suppress statements he made when he was interviewed by police

11  officers.  *Cabrera,* 2013 WL 5348082, *1.  In addition, Petitioner claimed that his trial counsel

12  was ineffective in failing to present expert testimony that would have demonstrated that he does

13  not have the psychological character of a person who would commit the offenses charged in this

14  case.  *Id.*  Finally, Petitioner claimed that the cumulative errors of trial counsel resulted in

15  prejudice.  Dkt. 9 at 2.

16         On September 25, 2013, the California Court of Appeal affirmed the conviction.  *Cabrera*,

17  2013 WL 5348082, *21; Resp't Ex. 3.  The state appellate court also considered Petitioner's

18  habeas petition, and summarily denied it in a separate order filed on the same date, September 25,

19  2013.  *In re Miguel Cabrera on Habeas Corpus*, Case No. H040001 (Sept. 25, 2013).

20         On November 5, 2014, Petitioner filed a petition for review in the California Supreme

21  Court.  *See People v. Cabrera*, Case No. S214435 (Nov. 5, 2014).

22         On November 21, 2013, Petitioner filed a state habeas petition in the California Supreme

23  Court, in which he raised his IAC claims.  *See Cabrera (Miguel) on H.C.*, Case No. S214777

24  (Nov. 21, 2013); Dkt. 9 at 2.

25  _____

26         [5] *People v. Marsden*, Cal. 3d 118 (1970), requires the trial court to permit a criminal
   defendant requesting substitution of counsel to specify the reasons for his request and generally to

27  hold a hearing.  This in short-hand is known as a "*Marsden* motion" or a request for a "*Marsden*
   hearing."  *See Schell v. Witek*, 218 F.3d 1017, 1021 (9th Cir. 2000).  This California rule

28  substantially parallels the one prescribed by the Ninth Circuit in *Hudson v. Rushen*, 686 F.2d 826,
   829 (9th Cir. 1982).  *See Chavez v. Pulley*, 623 F. Supp. 672, 687 n.8 (E.D. Cal. 1985).

1    On December 11, 2013, the California Supreme Court denied the petition for review.

2 Resp't Ex. 4.

3    On February 11, 2014, the state supreme court denied Petitioner's state habeas petition.

4 Resp't Ex. 5.

5    On May 30, 2014, Petitioner filed the instant habeas action in this Court.  Dkt. 1.  On

6 October 30, 2014, Petitioner filed his amended petition, which is the operative petition in this

7 action.  Dkt. 9.  Petitioner raises the same seven claims that he had raised on direct appeal, as well

8 as the IAC claims, which he had raised in his state habeas petitions.  *See id.*

9    On November 25, 2014, this Court issued an Order to Show Cause.  Dkt. 10.  Respondent

10 filed an Answer.  Dkt. 14.  Although given the opportunity to do so, Petitioner did not file a

11 Traverse.  The matter is fully briefed and ripe for adjudication.

12 **III.    LEGAL STANDARD**

13    A federal court may entertain a habeas petition from a state prisoner "only on the ground

14 that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

15 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

16 a district court may not grant a petition challenging a state conviction or sentence on the basis of a

17 claim that was reviewed on the merits in state court unless the state court's adjudication of the

18 claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

19 clearly established Federal law, as determined by the Supreme Court of the United States; or

20 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

21 the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong

22 applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

23 *Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

24 determinations, s*ee Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

25    A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

26 clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

27 reached by [the Supreme] Court on a question of law or if the state court decides a case differently

28 than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

United States District Court
Northern District of California

U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court

1   precedent.  *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir.

2   2000).  The last reasoned decision in this case is the state appellate court's unpublished disposition

3   issued on September 25, 2013, which relates to Petitioner's first seven federal claims in the

4   amended petition.

5        Where the state court gives no reasoned explanation of its decision on a petitioner's federal

6   claim, a federal court should conduct "an independent review of the record" to determine whether

7   the state court's decision was an objectively unreasonable application of clearly established federal

8   law.  *Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006); *Himes v. Thompson*, 336

9   F.3d 848, 853 (9th Cir. 2003).  Here, Petitioner presented the remaining federal claims—his IAC

10  claims—in his state habeas petitions, which the state appellate and supreme courts summarily

11  denied.  *See In re Miguel Cabrera on Habeas Corpus*, Case No. H040001 (Sept. 25, 2013); Resp't

12  Ex. 5.  As such, these IAC claims may be reviewed independently by this Court to determine

13  whether that decision was an objectively unreasonable application of clearly established federal

14  law.  *See Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

## IV.   DISCUSSION

### A.    Sufficiency of the Evidence of Forcible Lewd Acts

#### 1.    Background

18       Petitioner contends that the evidence was insufficient to support the jury's verdict of guilty

19  on five counts of forcible lewd acts under California Penal Code § 288(b)(1).  Dkt. 9 at 44-46.[6]

20  Specifically, he argues that there was no evidence that the lewd acts were committed by force or

21  duress.  *Id.*

22       In rejecting this claim, the state appellate court stated as follows:

23           We disagree and focus on the duress element of section 288,
             subdivision (b)(1).[FN 9]
24
             [FN 9:]  As this court recognized in *People v. Quinones* (1988) 202
25           Cal. App. 3d 1154, "force" means "'physical force substantially
             different from or substantially in excess of that required for the lewd
26           act' . . . ."  (*Id*. at p. 1158.)  We do not find evidence of force in the

27  ───────────────────

28       [6] Page number citations refer to those assigned by the Court's electronic case management
    filing system and not those assigned by the parties.

United States District Court
Northern District of California

evidence in this case.

Section 288, subdivision (b)(1) makes it a felony to commit a lewd or lascivious act upon a child under the age of 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

"Duress" means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Pitmon* (1985) 170 Cal. App. 3d 38, 50 (*Pitmon*) [disapproved on another ground as stated in *People v. Soto* (2011) 51 Cal. 4th 229].)

In determining whether there is sufficient evidence of duress, "the focus must be on the defendant's wrongful act, not the victim's response to it." (*People v. Soto, supra*, 51 Cal. 4th at p. 246 (*Soto*).) Our Supreme Court approved the following instruction defining duress. "'Duress means *the use of* a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do [or submit to] something that he or she would not otherwise do [or submit to]. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and (his/her) relationship to the defendant.'" (*Soto, supra*, 51 Cal. 4th at p. 246, fn. 9.) Such an instruction was given in this case.

Thus, in evaluating a sufficiency-of-the-evidence challenge to a finding of duress, we consider the totality of the circumstances "including the age of the victim, and [the victim's] relationship to [the] defendant." (*Pitmon, supra*, 170 Cal. App. 3d at p. 51.) Physical control over the victim, even if it is insufficient to constitute force may create duress. (*People v. Schulz* (1992) 2 Cal. App. 4th 999, 1005.) Other factors include the physical size disparity between the defendant and the victim that may contribute to the victim's sense of vulnerability. (*Pitmon, supra*, at p. 51.) In addition, "the position of dominance and authority of the defendant and his continuous exploitations of the victim" (*People v. Cardenas* (1994) 21 Cal. App. 4th 927, 940) are relevant factors in determining whether the sex crime was accomplished through duress. Other relevant circumstances may include threats to harm the victim, physically controlling a resisting victim, and threats of retribution if the victim reveals the molestation. (*People v. Cochran* (2002) 103 Cal. App. 4th 8, 14.)

Jane described how Petitioner would beat her if she did not listen; this started when she was about eight years old. Petitioner would use a looped belt to hit her on her behind or sometimes her back or legs. As to the lewd touching, Jane told the police that Petitioner would touch her vagina on almost a daily basis until she was 13. Petitioner was Jane's stepfather and according [to] Jane [Petitioner] was approximately 5' 8" and of a heavy build. Even at age 17 Jane was only 5' 4". Given the relationship between Petitioner and Jane, the size differential that would have existed when Jane was between the ages of eight and 13, Petitioner's continuous exploitation of Jane

and the physical abuse that Jane would suffer if she did not listen to Petitioner, we conclude that there was sufficient evidence that this was forcible lewd touching in the sense that Petitioner accomplished all the acts charged by means of duress. Jane acquiesced to all the acts because, as the evidence showed, if she did not Petitioner would likely beat her with a belt. That is duress. (*People v. Cochran*, supra, 103 Cal. App. 4th at p. 16 fn. 6. [when the victim is as young as this victim and is molested by her father in the family home, in all but the rarest cases duress will be present].)

Accordingly, we reject Petitioner's assertion that there was insufficient evidence to support his convictions for forcible lewd acts.

*Cabrera*, 2013 WL 5348082, *4-5 (footnote in original and brackets added).

### 2.    Applicable Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, __ U.S. __, 132 S. Ct. 2060, 2062 (2012) (per curiam). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

On habeas review, a federal court evaluating the evidence under *Jackson* and *Winship* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court

need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Under 28 U.S.C. § 2254(d), a federal habeas court applies *Jackson* and *Winship* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision "reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of the case." *Id.* at 1275 (citing 28 U.S.C. § 2254(d)(1)).

### 3.    Analysis

As explained above, on direct appeal, Petitioner argued that there was insufficient evidence to support his conviction under California Penal Code § 288(b)(1), which requires a finding that the lewd or lascivious act was accomplished "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Cal. Penal Code § 288(b). While Petitioner argued there was no evidence that the lewd acts were committed by force *or* duress, the state appellate court only focused on duress because it "d[id] not find evidence of force in the evidence in this case." *Cabrera*, 2013 WL 5348082, *4 n.9.

The California courts define "duress" as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." *People v. Schultz*, 2 Cal. App. 4th 999, 1005

12

United States District Court
Northern District of California

1   (1992).  And as the state appellate court explained above, the totality of the circumstances are

2   considered, including the age of the victim, the familial relationship between the victim and the

3   perpetrator, and the disparity in size between the victim and the perpetrator.  *Cabrera*, 2013 WL

4   5348082, *5 (citing *Cochran*, 103 Cal. App. 4th at 14).

5        The state appellate court's rejection of Petitioner's insufficiency of the evidence claim was

6   not an "objectively unreasonable" application of *Jackson* and *Winship*.  *See* 28 U.S.C. § 225(d);

7   *Juan H.*, 408 F.3d at 1275.  The state appellate court reasonably determined that there was

8   substantial evidence of duress in this case and thus there was sufficient evidence to support

9   Petitioner's convictions for forcible lewd acts upon a child under the age of 14 under California

10  Penal Code § 288(b)(1).

11        The record shows, at the time of the offense, Jane was around seven or eight years old

12  when Petitioner began molesting her.  4RT 314-315.  Petitioner was Jane's stepfather and filled a

13  parental role.  4RT 311.  Jane was afraid to tell anyone about the sexual abuse because Petitioner

14  would "be locked up," her mother would lose her husband, and her family would lose Petitioner's

15  financial support.  5RT 369-370.  Furthermore, the record shows that Petitioner touched Jane in a

16  sexual manner every year of her life between the ages of seven and seventeen.  4RT 314-320.  All

17  of the sexual abuse was against her will.  4RT 320.  She never consented to it or initiated sexual

18  intercourse with Petitioner.  4RT 321; 5RT 362.  Sometimes Petitioner forced her, and other times

19  she went along with it for fear of getting hit.  4RT 320-321; 5RT 357-358, 360-362, 417.

20  Although Jane did not describe specific acts of force, she did testify that Petitioner slapped her

21  when she said no to having sexual intercourse with him.  4RT 320.  Thus, the aforementioned

22  evidence shows that Petitioner was able to perform acts which he otherwise could not have

23  performed, and Jane acquiesced to acts, which she otherwise would not have submitted to, because

24  of implied threats of force from Petitioner.

25        Viewing the aforementioned evidence in the light most favorable to the prosecution, a

26  rational trier of fact could have found that, based on the totality of the circumstances, Jane's

27  acquiescence was due at least in part to an implied threat of force from Petitioner, which shows

28  there was sufficient evidence of duress.  Thus, the state appellate court's decision was reasonable

13

in rejecting the sufficiency-of-the-evidence challenge to a finding of duress and concluding that any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt on the five counts of forcible lewd acts.  Accordingly, the state appellate court's denial of this claim was not an unreasonable application of *Jackson* and *Winship*.  This claim is DENIED.

### B.    Lesser Included Offenses

Petitioner claims that the trial court failed to instruct the jury on lesser-included offenses thereby violating his rights to due process under both the federal and California Constitutions.  Dkt. 9 at 46.  Specifically, Petitioner contends that the trial court should have given the jury the option of convicting him of non-forcible lewd acts with a child pursuant to California Penal Code § 288(a) in counts five through nine[7]; unlawful sexual intercourse with a minor pursuant to California Penal Code § 261.5(a) in counts one and 10 through 13; and non-forcible oral copulation pursuant to California Penal Code § 288a(b)(2) and (c)(1) in count three.  *Id.*  Petitioner also asserts that the failure to instruct on these lesser included offenses was prejudicial.  *Id.*

The state appellate court rejected Petitioner's claim upon finding no error in the trial court's failure to instruct on the aforementioned lesser-included offenses.  *Cabrera*, 2013 WL 5348082, *5-8.

The failure to instruct on a lesser-included offense in a capital case is constitutional error if there was evidence to support the instruction.  *See Beck v. Alabama*, 447 U.S. 625, 638 (1980).  But the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998).  Petitioner's claim that the trial court erred by not instructing the jury on the aforementioned lesser-included offenses—as to all the forcible sex crimes—fails because Petitioner's case was not a capital case.  *See id.*

However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule."  *Solis*, 219 F.3d at 929

---

[7] The Court notes that Petitioner refers to the trial court's failure of instructing on the lesser-included offenses as to "counts four through nine" in this claim; however, the jury found Petitioner not guilty of forcible lewd acts in count four.  Therefore, the Court assumes that Petitioner was referring to counts *five* through nine.

United States District Court
Northern District of California

United States District Court
Northern District of California

(citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser-included offense.  *Id.* at 929-30 (no duty to instruct on voluntary manslaughter as lesser-included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).  However, this Court finds that Petitioner's claim is without merit.  Petitioner has not presented any evidence showing that his case is an exception to the general rule announced in *Solis*.

Accordingly, Petitioner is not entitled to federal habeas relief on his failure to give a lesser-included offense instruction claim because the state appellate court's rejection of the claim cannot be said to be objectively unreasonable.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 409.  Therefore, this claim is DENIED.

### C.   Circumstantial Evidence Instruction

#### 1.   Background

Petitioner claims that the trial court erred when it failed to instruct the jury with CALCRIM No. 224 regarding circumstantial evidence.   Dkt. 9 at 55.  He argues that this error "reduced the prosecution's burden of proof and denied Petitioner his right to due process and trial by jury under the Sixth and Fourteenth Amendments." *Id.*  He concedes, however, that the trial court did instruct the jury with CALCRIM No. 223 (which explains the difference between proving facts by direct evidence or by circumstantial evidence) as well as CALCRIM No. 225 (which is a similar but more specific instruction regarding the use of circumstantial evidence to prove intent).

The state appellate court held that CALCRIM No. 225, and not CALCRIM No. 224, was the appropriate instruction given the evidence at trial by stating as follows:

> Appellant contends that the trial court erred by failing to instruct on how to consider circumstantial evidence of facts other than his mental state.  Appellant asserts that the disputed issue in this case concerned whether the alleged acts occurred, not whether he had the required intent or mental state.  Appellant argues the trial court was required to instruct the jury with CALCRIM No. 224[FN 13] and by failing so to do the court violated its duty to instruct on general principles of law relevant to the issue of the case, reduced the prosecutor's burden of proof and deprived him of his constitutional

15

1

2

rights to due process and trial by jury.  Furthermore, the giving of CALCRIM No. 225[FN 14] did not render the error harmless and may have contributed to the prejudice.

3

4

5

6

7

8

9

[FN 13:] CALCRIM No. 224 provides:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

10

11

12

13

14

15

16

17

18

19

20

[FN 14:] As given in this case, CALCRIM No. 225 provided, "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent.  The instruction for each crime and allegation explains the intent required.  [¶]  An intent may be proved by circumstantial evidence.  Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable interpretation supported by the circumstantial evidence is that the defendant had the required intent.  [¶]  If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

21

22

23

24

25

26

27

28

*Background*

The court instructed the jury with CALCRIM No. 223 on the definitions of direct and circumstantial evidence and as appellant points out with CALCRIM No. 225.   As given in this case, CALCRIM No. 223 explained to the jury that "[f]acts may be proven by direct or circumstantial evidence or by a combination of both.  [¶]  Direct evidence can prove a fact by itself.  For example, it a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining.  [¶]  Circumstantial evidence also may be called indirect evidence.  Circumstantial evidence does not directly prove the fact to be decided but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question.  For instance, if a witness testifies that he saw someone coming inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence; because it may support a

conclusion that it was raining outside.   [¶]   Both direct and circumstantial evidence are acceptable types of evidence that prove or disprove the elements of a charge including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other.   Neither is entitled to greater weight than the other.   You must decide whether a fact in issue has been proved based on all the evidence."

We consider a claim of instructional error under the de novo standard of review.   Nevertheless, "'"'[i]n determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.". . .'"   (*People v. Ramos* (2008) 163 Cal. App. 4th 1082, 1088.)

CALCRIM Nos. 224 and 225 both instruct the jury on the proper use of circumstantial evidence.   CALCRIM No. 224 and CALCRIM No. 225 are each accurate statements of the law.   (*People v. Ibarra* (2007) 156 Cal. App. 4th 1174, 1186-1187 [upholding CALCRIM No. 224]; *People v. Golde* (2008) 163 Cal. App. 4th 101, 118 [upholding CALCRIM No. 225].)   CALCRIM No. 225 is to be used in place of CALCRIM No. 224, "'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' [Citations.]"   (*People v. Samaniego* (2009) 172 Cal. App. 4th 1148, 1171-1172 (*Samaniego*).)   Both instructions "provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive."   (*Id.* at p. 1172.)

The more general circumstantial instruction (CALCRIM No. 224 or its predecessor CALJIC No. 2.01)[FN 15] is proper where issues such as identity rest primarily on circumstantial evidence.   (*People v. Rogers* (2006) 39 Cal. 4th 826, 885 (*Rogers*).)[FN 16]   However, it is error to give the more specific instruction on circumstantial evidence of intent or mental state (CALCRIM No. 225 or its predecessor CALJIC No. 2.02) where the defendant's intent is not the only element of the prosecution's case resting on circumstantial evidence.   *(Rogers, supra*, 39 Cal. 4th at p. 885; *People v. Cole* (2004) 33 Cal. 4th 1158, 1222.)

[FN 15:] "CALCRIM No. 224 corresponds to former CALJIC No. 2.01 and CALCRIM No. 225 corresponds to former CALJIC No. 2.02.   Case law addressing CALJIC instructions is still generally applicable to the corresponding CALCRIM instruction.   [Citation.]"   (*People v. Contreras* (2010) 184 Cal. App. 4th 587, 591, fn. 4.)

[FN 16:] In *Rogers, supra*, 39 Cal. 4th 826, there was no direct evidence linking the defendant to a murder, and so the prosecutor relied on circumstantial evidence to prove identity.   (*Id.* at p. 885.)   The trial court instructed on the use of circumstantial evidence to prove only mental state and failed to instruct more generally on the use of such evidence to prove other elements.   (*Ibid.*)   The Supreme Court held that it was error not to give the more generally applicable instruction.   However, the court found the error harmless because

United States District Court
Northern District of California

the evidence of identity was "strong," and the evidence pointing to innocence was "weak." (*Id*. at p. 886.) Under the circumstances, the court found no reasonable probability the jury would have found that the defendant did not kill the victim had the general instruction been given. (*Ibid*.)

The more general circumstantial instruction, CALCRIM No. 224 is only required where the prosecution's case substantially relies on circumstantial evidence. "'[W]here circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given.' [Citation.]" (*People v. Brown* (2003) 31 Cal. 4th 518, 562.) Thus, in *People v. Yeoman* (2003) 31 Cal. 4th 93, where the defendant made incriminating extrajudicial admissions, the court held that "the trial court reasonably determined for purposes of instructing the jury that the People's case did not rest substantially or exclusively on circumstantial evidence." (*Id*. at p. 143.)

In *People v. McKinnon* (2011) 52 Cal. 4th 610 *(McKinnon)*, our Supreme Court reaffirmed that the trial court is required to instruct the jury with the more general circumstantial evidence instruction "when the prosecution relies substantially on circumstantial evidence to prove guilt. [Citations.] Conversely, the instruction need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence, due to the 'danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime.' [Citations.]" (*Id*. at p. 676.)[FN 17]

[FN 17:] The *McKinnon* court was concerned with CALJIC No. 2.01. However, as noted ante, "[c]ase law addressing CALJIC instructions is still generally applicable to the corresponding CALCRIM instruction. [Citation.]" (*People v. Contreras, supra*, 184 Cal. App. 4th at p. 592, fn. 4.)

We reject appellant's argument that circumstantial evidence comprised a significant part of the prosecution's case. As respondent points out, the prosecution did not rely exclusively, substantially, or even significantly on circumstantial evidence to prove its case against appellant. Here, the prosecution relied upon direct evidence to establish guilt—Jane's initial accusations given to police officers that appellant sexually molested her over a nine-year period. Testimony from the victim is direct evidence. (*People v. Baldwin* (1979) 97 Cal. App. 3d 396, 401 [eyewitness testimony is direct evidence].) Although the jury had to determine whether or not this initial accusation was credible, it did not have to determine what reasonable inferences could be drawn from Jane's testimony. Either she was credible or she was not. A jury's credibility determination has to do with the weight of the evidence, or value of the evidence, not its nature. (*McKinnon, supra*, 52 Cal. 4th at p. 676, fn. 40.)

Even if we were to accept that appellant's extra-judicial admission that he had a sexual encounter with Jane was circumstantial evidence that the crimes were committed, corroborative

circumstantial evidence does not require the more general circumstantial evidence instruction. (*McKinnon, supra*, at p. 676.)

In sum, we reject appellant's argument that the trial court erred in failing to give CALCRIM No. 224.

*Cabrera*, 2013 WL 5348082, *8-10 (footnotes in original).

### 2.    Applicable law

"[S]tate courts are the ultimate expositors of state law[.]" *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Because claims for error in jury instructions generally present state law questions, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The exception to the bar on habeas relief for faulty jury instructions is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Estelle*, 502 U.S. at 72).  "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  A federal court examining a federal habeas petition determines whether the petitioner's fourteenth amendment rights were violated due to instructional error by looking at the total context of events at trial: "not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *U.S. v. Frady*, 456 U.S. 152, 169 (1982) (citing *Cupp*, 414 U.S. at 147).

### 3.    Analysis

As mentioned above, Petitioner argues that the trial court erred in failing to instruct the jury with CALCRIM No. 224, and that the giving of CALCIM No. 225 did not render the error harmless and may have contributed to the prejudice.  Dkt. 9 at 58.

Here, as explained above, the state appellate court found that CALCRIM Nos. 224 and 225 "both instruct[ed] the jury on the proper use of circumstantial evidence," and they were "each accurate statements of the law." *Cabrera*, 2013 WL 5348082, *9.  However, the state appellate court determined that the "more general circumstantial instruction, CALCRIM No. 224 is only

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

required where the prosecution's case *substantially* relies on circumstantial evidence." *Id.* at *10 (emphasis in original).  The state appellate court then reasonably determined Petitioner's conviction was based primarily on direct evidence, specifically Jane's initial accusations about the sexual molestation by Petitioner over a nine-year period.  Thus, the state appellate court reasonably rejected Petitioner's arguments that circumstantial evidence comprised a significant part of the prosecution's case, and that the trial court erred in failing to give CALCRIM No. 224. Petitioner offers no credible argument that the failure to instruct the jury with CALCRIM No. 224 was erroneous under state law, much less that it violated his federal due process rights.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (holding, where the alleged error is the failure to give an instruction, the burden on a petitioner is "especially heavy" because any such omission is "less likely to be prejudicial than a misstatement of the law").  Further, there is nothing to suggest that the failure to instruct the jury with CALCRIM No. 224 had any impact on the outcome of his case. *See Calderon v. Coleman*, 525 U.S. 141, 145-56 (1998) (holding habeas courts must determine if constitutionally inadequate instructions were harmless before granting habeas relief).

Accordingly, the state appellate court's decision was not an unreasonable determination of facts or application of clearly established Supreme Court law.  This Court therefore DENIES Petitioner's claim that the trial court erred in failing to give CALCRIM No. 224.

### D.   Admission of CSAAS Evidence

#### 1.   Background

Petitioner next challenges the admission of expert testimony on CSAAS.  Dkt. 9 at 59-67. The state appellate court gave the following background relating to this claim:

> Petitioner argues that it was error for the trial court to admit expert testimony on CSAAS because there was no evidence that the jurors needed to be disabused of any misconceptions; and instructing the jury that it could use the expert testimony to consider the believability of the victim's testimony "served to improperly bolster the credibility of [Jane's] initial allegations."

> Before trial, Petitioner requested that the trial court preclude the prosecution from admitting any testimony about CSAAS.  Defense counsel argued that the proposed testimony did not pass the *Kelly-Frye* test,[FN 18] that it would be irrelevant and unduly prejudicial.

> [FN 18:]  *People v. Kelly* (1976) 17 Cal. 3d 24, *Frye v. United States*

United States District Court
Northern District of California

(D.C. Cir.1923) 293 Fed. 1013.

During the hearing on in limine motions, the trial court asked the prosecutor why he was offering the CSAAS testimony of Carl Lewis. The prosecutor explained that Jane had recanted her allegations at the preliminary hearing a few months after her initial report. Accordingly, the prosecutor asserted that the CSAAS testimony was "necessary to explain that this type of recantation is something that does happen with victims because of fear, because of familial issues, because of the pressures related to being a part of the criminal justice system."

Defense counsel argued that the prosecutor had not made a proper foundation for admission of the CSAAS testimony. Defense counsel noted that under case law CSAAS testimony was admissible only to rebut misconceptions, not to engender sympathy for the victim. Defense counsel pointed out that the prosecutor had not identified a specific popular misconception related to CSAAS.

The prosecutor asserted that it was a popular misconception that a victim would not recant allegations, to which the court asked whether the prosecutor was seeking to admit CSAAS testimony on the issue of delayed disclosure. The prosecutor clarified that he wanted CSAAS testimony without limitation.

Defense counsel next argued that the CSAAS testimony was only relevant if it assisted the trier of fact and proposed that the prospective jurors be questioned on any popular myths about child sexual abuse they might have. The trial court agreed that the parties could voir dire on this subject, but indicated that the court might still admit the evidence even if all the jurors said that they did not subscribe to the myths that CSAAS was designed to rebut.

During voir dire, the court questioned some jurors individually on some CSAAS concepts. Defense counsel followed up by questioning the 18 prospective jurors about CSAAS concepts as a group. Specifically, counsel asked the group whether they believed that a teenager was lying because he or she waited years to make a claim of abuse. In addition, he asked whether they would think that no abuse happened if a teenager reported sexual abuse but then retracted the allegation. According to defense counsel, to each question the prospective jurors unanimously answered, "No."

Later defense counsel asked the prospective jurors as a group whether any of them thought they knew "how a kid would look if they had in fact been sexual[ly] abused." Again, all the jurors responded "No."[FN 19]

[FN 19:]  The alternate jurors were questioned in a similar fashion and agreed that neither delayed disclosure nor retraction would automatically mean that the child was lying or that the child had not been abused.

During the trial, again, defense counsel objected to Lewis's proposed CSAAS testimony. Counsel argued that in light of the jury voir dire, the expert testimony was not necessary to help the

jury.  The court noted that the jurors had agreed that delayed disclosure and retraction did not mean a report of sexual abuse was false.  The prosecutor argued that the jurors had merely noted that they were "open to that possibility," but that they might still have misconceptions.

Defense counsel reminded the court that not one juror said that delayed disclosure or retraction meant that there had been no sexual abuse.  The trial court took the matter under submission; the court commented "not each and every juror was voir dired on the question" but "there was consensus" among the jurors.

Subsequently, the court discussed the issue with counsel.  The court noted that "over time what may be generally accepted as myths become no longer myths; and when we reach that point, if we've reached that point, then in the narrow scope of a particular factual situation or case this testimony may not be relevant and necessary.  On this case I will accept the responsibility and the blame.  I'm not prepared to say that all 13 jurors have accepted and expressed that . . . they no longer subscribe to these myths.  All the jurors we asked basically said that, but I don't think we asked all 13, and I don't think we have that commitment on the record.  And therefore . . . I am satisfied that the testimony of the experts in this area will be appropriate under [Evidence Code section] 801 for one or more of the jurors."  Accordingly, the CSAAS experts were allowed to testify as noted ante.

Later, the court instructed the jurors pursuant to CALCRIM No. 1193, on how to consider the CSAAS testimony of both the prosecution's expert and the defense expert.  Specifically, the court told the jury, "You have heard testimony from Carl Lewis and Dr. Annette Ermshar regarding Child Sexual Abuse Accommodation Syndrome.  Mr. Lewis and Dr. Ermshar's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [Jane] Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

*Cabrera*, 2013 WL 5348082, *10-12 (footnotes in original).

Petitioner claims that the trial court violated his right to due process by admitting the CSAAS evidence given that during voir dire the jurors did not demonstrate that they had any "preconceived notions related to delayed disclosure or retractions."  Dkt. 9 at 59.  Specifically, Petitioner alleges that the CSAAS testimony "was not [r]elated  to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . and it was not necessary since there was no 'myth or misconception' to rebut."  *Id.*  Finally, Petitioner argues that the trial court "further compounded the error by instructing the jury, pursuant to

1   CALCRIM No. 1193, that it could use the expert testimony about CSAAS to evaluate [Jane's]

2   believability." *Id.*

3        The state appellate court affirmed the trial court's admission of expert testimony regarding

4   CSAAS, because the testimony was not admitted to establish that Petitioner molested Jane, but it

5   was "used to describe and explain how children commonly react to sexual molestation" *Cabrera*,

6   2013 WL 5348082, *12 (citing *People v. Bowker*, 203 Cal. App. 3d 385, 394 (1988)).  The court

7   noted that "[c]ommon stress reactions of children who have been sexually molested 'may include

8   the child's failure to report, or delay in reporting, the abuse" and that a "sexually molested child

9   may also react by recanting his or her story in whole or part." *Id.* (citations omitted).  The court

10  found "entirely speculative" Petitioner's argument that "because all the jurors when questioned as

11  a group answered 'no' to defense counsel's questions regarding delayed disclosure and recantation

12  this particular jury was not constrained by any popular myths about how a child would react to

13  sexual abuse." *Id.* at *13.  The court then made reference to California case law concerning

14  CSAAS and rejected Petitioner's position relating to the CSAAS testimony:

15           . . . appellant's position is contrary to the controlling authority in this
    state.  (*See People v. Brown* (2004) 33 Cal. 4th 892, 906-907
16           [reaffirming earlier reasoning for admitting CSAAS evidence].)  To
    the extent that our Supreme Court has recognized that such evidence
17           may be relevant, useful, and admissible in a given case, as an
    intermediate appellate court, we are in no position to rule otherwise.
18           (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal. 2d 450,
    455.)
19
             In any event, the expert's testimony concerning CSAAS was helpful
20           in explaining the different reactions that some victims have to sexual
    abuse.  (*See Patino*, *supra*, 26 Cal. App. 4th at p. 1744[8] [CSAAS
21           evidence admissible to disabuse misconceptions about how a child
    reacts to molestation].)  Jurors may have an understanding that
22           victims of abuse are reluctant to report the offense and may later
    recant their report, but they may not understand the reasons for the
23           delayed reporting, or why the victims recant.

24           Accordingly, the trial court could have reasonably found that the
    expert testimony would add to the jurors' common fund of
25           information regarding the reactions of abuse victims.  As such, we
    cannot say that the trial court erred in allowing testimony on
26           CSAAS on the issue of delayed reporting and recantation.  (*People
    v. McDowell* (2012) 54 Cal. 4th 395, 426 [the trial court has broad

27

28
    _____
         [8] *People v. Patino*, 26 Cal. App. 4th 1737 (1994).

                                    23

1    discretion in deciding whether to admit or exclude expert
     testimony].)

2    *Cabrera*, 2013 WL 5348082, *13 (footnote added).

3        Finally, the state appellate court further found that the trial court properly gave the jury a

4    limiting instruction, CALCRIM No. 1193, on how to evaluate the CSAAS evidence, stating as

5    follows:

6        When reviewing a purportedly erroneous instruction, we ask
         whether there is a reasonable likelihood that the jury understood the
7        instruction in the improper manner appellant suggests. In making
         this inquiry, we consider the language in question in the context of
8        the overall charge. (*People v. Richardson* (2008) 43 Cal. 4th 959,
         1028.)
9
10       There is no reasonable likelihood that the jury understood the
         instruction as appellant asserts. The language permitting jurors to
         use CSAAS testimony to evaluate the believability of the
11       complaining witnesses refers simply to the fact that evaluation of the
         credibility of the alleged victims may require consideration of
12       common reactions of such victims. This is proper. Further, the
         court admonished the jury that CSAAS testimony is not evidence
13       that appellant committed any of the charged crimes. In addition, the
         court delivered accurate instructions relating to reasonable doubt
14       and the presumption of innocence.

15       The final sentence of CALCRIM No. 1193, to which appellant
         objects, merely informs the jury that it may consider the CSAAS
16       evidence for purposes of deciding only (1) whether the conduct of a
         putative molestation victim is consistent with the conduct of
17       someone who has actually been molested, and (2) whether the
         testimony of a putative molestation victim is credible. The
18       instruction does not require the jury to consider the CSAAS
         evidence at all. It merely informs the jury of the very narrow issues
19       to which the CSAAS evidence may be considered relevant. (*See
         People v. Brown*, *supra*, 33 Cal. 4th at p. 906.)
20
21       We reject the premise of appellant's argument. The instruction did
         not tell the jury to believe Jane if her conduct was consistent with
22       the CSAAS testimony. Jane's credibility was very much in dispute
         and an important question for the jury to determine. Simply put, we
23       disagree with appellant's view that the instruction effectively, albeit
         implicitly, told jurors the CSAAS evidence could be used to
24       determine whether Jane's claim was true. Instructing a jury that
         they may consider CSAAS testimony in evaluating a complaining
25       witness's credibility is simply not the same as telling them they can
         use the CSAAS testimony to determine whether the claim is true.
26       Appellant's interpretation reads into the instruction something that is
         not there.

27       Accordingly, we reject appellant's argument that the jury was
28       improperly instructed on how to use the expert testimony on
         CSAAS.

24

1    *Id.* at *13-14.

2              **2.      Applicable Law**

3              The Ninth Circuit has held that CSAAS testimony is admissible in federal child sexual

4    abuse trials, where the testimony concerns general characteristics of victims and is not used to

5    opine that a specific child is telling the truth.  *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir.

6    2003); *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) (per curiam); *United States v.*

7    *Antone*, 981 F.2d 1059 (9th Cir. 1992).  In *Brodit*, the Ninth Circuit recognized that CSAAS

8    evidence "describes various emotional stages, experienced by sexually abused children, that may

9    explain their sometimes piecemeal and contradictory manner of disclosing abuse."  350 F.3d at

10   991.  The court observed that inconsistencies in a child's account of abuse, including delays in

11   reporting, do not necessarily mean the child is lying.  *Id.*  Ultimately, the *Brodit* majority approved

12   of the California Court of Appeal's holding in *People v. Patino*, 26 Cal. App. 4th 1737 (1994),

13   that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's

14   due process rights.  *Brodit*, 350 F.3d at 991.  The Ninth Circuit concluded:

15                     [W]e have held that CSAAS testimony is admissible in federal
                       child-sexual-abuse trials, when the testimony concerns general
16                     characteristics of victims and is not used to opine that a specific
                       child is telling the truth.  (Citations omitted).  Although those cases
17                     did not address due process claims, both rejected the contention that
                       CSAAS testimony improperly bolsters the credibility of child
18                     witnesses and precludes effective challenges to the truthfulness of
                       their testimony.
19
     *Id.* (citing *Bighead*, 128 F.3d 1329).
20
21             The Ninth Circuit has also rejected the contention that CSAAS testimony improperly

22   bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of

23   their testimony.  *See Bighead*, 128 F.3d at 1330-31; *Antone*, 981 F.2d at 1062.  In *Bighead*, the

24   Ninth Circuit held that there was no abuse of discretion in the district court's admission of expert

25   testimony about certain characteristics of child sexual abuse victims in the prosecution's rebuttal.

26   *See* 128 F.3d at 1330-31.  The court noted that the expert did not testify about the facts of the

27   particular case, or about the particular victim, whom she had never examined.  *Id.*  Rather, the

28   testimony was limited to evidence of "delayed disclosure" and "script memory" which were

United States District Court
Northern District of California

indicative of abused children as a class of individuals. *Id.* Further, in addressing a relevancy challenge, the court stated, "[the expert's] testimony had significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony." *Id.* The court affirmed the defendant's conviction, holding that, the district court did not abuse its discretion in permitting the expert to testify. *Id.* The court also noted that, "[r]egardless, the jury was free to determine whether the victim delayed disclosure or simply fabricated the incidents." *Id.* at 1331.

### 3.     Analysis

Petitioner's challenge to the admission of CSAAS evidence is foreclosed by *Brodit*. *See* 350 F.3d at 991. As explained above, the Ninth Circuit has upheld the use of CSAAS evidence when, as in the instant case, it is used to explain the general characteristics of victims of sexual abuse and is not used to opine on the credibility of a specific child. *See id.* Moreover, the record shows that the trial court properly admonished the jury twice which ensured that the jury understood how to consider the CSAAS evidence, consistent with *Brodit*. *See id. Brodit*'s constitutional limitations were upheld because the trial court's limiting instruction properly cautioned the jury that CSAAS evidence could only be used to show that Jane's testimony was not inconsistent with symptoms commonly experienced by abused children, and that it was offered in this case to rebut implied misconceptions that child abuse victims would not recant allegations or that their delayed disclosure and accommodation indicate untruthfulness. *See id.* This use of CSAAS evidence comports with constitutional requirements. In addition, Petitioner cites to no Supreme Court authority to support his claim that the trial court's decision to admit the CSAAS evidence violated his right to due process.

Assuming arguendo, the admission of the CSAAS evidence was in error, no prejudice resulted under *Brecht*. The record shows that Petitioner presented his own CSAAS expert, Dr. Ermshar, to refute some of the assertions made by Mr. Lewis, the prosecution's CSAAS expert. Therefore, the jury was informed of the possible limitations on such evidence.

As mentioned above, Petitioner argues the prosecution's expert testimony was not necessary because there were no myths or misconceptions to rebut for the jury because the jurors

United States District Court
Northern District of California

United States District Court
Northern District of California

1    answered "no" to defense counsel's question relating to myths and misconceptions associated with

2    CSAAS. Dkt. 9 at 59. However, the trial court pointed out that "not each and every juror was

3    voir dired on the question." 6RT 480. Thus, the state appellate court reasonably found that

4    Petitioner's assertion that the jurors must not have been constrained by popular myths about how

5    child molestation victims should react was speculative. *Cabrera*, 2013 WL 5348082, *13. In

6    addition, the state court was reasonable in determining that the prospective jurors' generic

7    responses to cursory voir dire questions did not foreclose the possibility that the expert testimony

8    would be beneficial to the jury's understanding of the myths associated with CSAAS. *Id.*

9        Finally, as explained above, the state appellate court reasonably rejected Petitioner's

10   argument that CALCRIM No. 1193 "effectively, albeit implicitly, told the jurors the CSAAS

11   evidence could be used to determine whether Jane's claim was true." *Id.* at *14. Instead, the state

12   appellate court stressed that the instruction "did not tell the jury to believe Jane if her conduct was

13   consistent with the CSAAS testimony." *Id.* Rather, the state appellate court noted that the

14   "language permitting jurors to use CSAAS testimony to evaluate the believability of the

15   complaining witnesses refers simply to the fact that that evaluation of the credibility of the alleged

16   victims may require consideration of common reactions of such victims." *Id.* (citations omitted).

17   The state appellate court added that the trial court delivered accurate instructions relating to

18   reasonable doubt and the presumption of innocence. *Id.*

19       The jury is presumed to have understood and followed the instruction that the expert's

20   testimony could not be used as proof that Jane's molestation claims were true. *See Townsend v.*

21   *Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) ("The law presumes that the jury follows the

22   instructions given."). Therefore, the state appellate court's conclusion that there was no

23   reasonable likelihood the jury would have read the instruction as Petitioner asserts was reasonable.

24   Nor was any error prejudicial.

25       Accordingly, Petitioner fails to establish that the state appellate court's rejection of

26   Petitioner's claim relating to the CSAAS testimony was contrary to, or an unreasonable

27   application of, clearly established United States Supreme Court precedent, nor that it was based

28   upon an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C.

§ 2254(d)(1), (2).  Accordingly, this claim is DENIED.

### E.    Cumulative Error

Petitioner considers together the aforementioned claims to assert that the trial court's instructional and evidentiary errors cumulatively resulted in a violation of his right to a fair trial. Dkt. 9 at 67-69.  The state appellate court rejected this claim because there was no error by the trial court.  *Cabrera*, 2013 WL 5348082, *14.

"Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant.'"  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)).  Where there is no single constitutional error, "there is nothing to accumulate to a level of a constitutional violation."  *Id.*

Because Petitioner has not shown constitutional error stemming from his claims of trial errors, his cumulative error claim necessarily fails.  Accordingly, the state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly-established Supreme Court authority.   Therefore, this claim is DENIED.

### F.    Failure to Hold a *Marsden* Hearing

#### 1.    Background

Petitioner contends that the trial court violated his Sixth Amendment right to counsel when it failed to conduct a *Marsden* hearing on the day of his sentencing hearing. Dkt. 9 at 69. Specifically, Petitioner asserts that he requested a new attorney on the day of sentencing; and because the trial court failed to conduct a *Marsden* hearing, his right to counsel was violated.  *Id.* at 69-70.

The state appellate court gave some background relating to this claim and rejected it, as follows:

> Initially, appellant made a *Marsden* motion on March 1, 2011, before the trial began.  Appellant complained that his deputy public defender was pressuring him to take an offer of 30-40 years in state prison when he was not guilty of the charges.  In addition, he complained that trial counsel's investigation had found nothing helpful to his defense.  In response, defense counsel asserted that no defense evidence could surmount appellant's admission to having

United States District Court
Northern District of California

had intercourse with Jane once.  The trial court asked counsel if he had considered asking for suppression of appellant's statement and counsel responded that he had.  Appellant stated that he had lied to the police and made the admission out of fear of the other charges.  Ultimately, the trial court denied the motion.

On the day of the sentencing hearing, appellant complained to the court that trial counsel did not help him at all during the trial; counsel never made any motions on his behalf, refused to withdraw from the case and could not obtain an acquittal when the prosecution had no proof.  The trial court told appellant that none of his complaints were valid; not one of the motions that appellant mentioned would have been granted, counsel was an extremely experienced attorney who aggressively defended him and presented the case with the highest level of professionalism, and the evidence against him was legally sufficient.  Specifically, the court told appellant, "I don't know what more you expected [trial counsel] to do.  He aggressively protected your interests within the framework of what you gave him.  He aggressively presented your case.  The jury rejected it."

The rule from *Marsden* is well settled: "''''When a defendant seeks to discharge his appointed counsel and substitute another [appointed] attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.  [Citation.]  A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'''  [Citation.]  The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would "substantially impair" the defendant's right to effective assistance of counsel.''  (*People v. Abilez* (2007) 41 Cal. 4th 472, 487-488.)

It is equally well settled that to invoke a defendant's right under *Marsden* to substitute one appointed counsel for another, "[a]lthough no formal motion is necessary, there must be 'at least some clear indication by defendant that he wants a substitute attorney.'  [Citation.]"  (*People v. Mendoza* (2000) 24 Cal. 4th 130, 157.)  Grumblings about counsel's performance is insufficient. (*People v. Lucky* (1988) 45 Cal. 3d 259, 281; *People v. Lee* (2002) 95 Cal. App. 4th 772, 780.)

At the sentencing hearing, defense counsel told the court that appellant wanted to address the court.  The following colloquy occurred:

"[Appellant]: . . . Before you find me guilty, before I am sentenced, I would like to please ask your permission to say a few things.

The Court: Go ahead, sir.

[Appellant]: I don't understand English nor can I read it, but someone explained my rights to me before the trial.  I had the opportunity to speak with the judge and with the public defender in court.  I let him know that my attorney is not doing anything towards my defense.  For example, my attorney could have brought motions on my behalf,—

The Court:  What kind of motions, sir?

[Appellant]—and he didn't bring—

The Court:  What kind of motions?

[Appellant]—any motions.  Never.

The Court:  Motions for what?"

Appellant stated that counsel could have brought a motion to "have the charges dismissed" and a "1538.5 motion" and "1385" and "995" and "1118.1 A."  The court told appellant that none of these motions would have had any legal validity.  When appellant asked why, the court told him "[t]hat was what your attorney was to evaluate.  There was no legal basis, as I understand it, for those motions to be brought."  Appellant reiterated that counsel "didn't do it."  Then he asked the court to look at some papers he had.  The court asked defense counsel to explain what appellant was asking for.  Counsel responded that he was not sure, but would look at appellant's documents.  After so doing, counsel told the court they appeared "to be photo copies of the California Criminal Defense Practice book."  Appellant confirmed that that was correct, and the court said it did not need to see the document, but allowed appellant to continue as follows.

"[Appellant]:  Before you pronounce that I'm guilty—well, I already mentioned the bit about the motions.  What I wanted to say is the judge never let me change attorneys . . . and my attorney said that he was not going to withdraw from the case, that he would stay with me until the trial.  And I had the right to get a different attorney, and I was denied that right.  I had a right to get a different attorney because this one was not helping me.  In the space of one year he only went to see me twice out in Milpitas.  That's not enough time to prepare a defense for me.  Why was I denied this right?  I had the right to have a different attorney.  I think he had something personal with me, because we were always arguing.  I told him several times, but he said, no, he had to stay with my case.  He stood firm with that until the end of the trial.  We were always arguing.  We were always fighting.  And I was never able to talk with him or ask him questions.  How was he going to defend me if he had only seen me twice during the year that I was incarcerated?"

The court asked appellant if he had anything else to say, to which appellant replied, "Why was I found guilty?  The D.A. did not have evidence.  I never saw—I never saw that they showed evidence for the crimes I was accused of.  My attorney knows that very well.  How was I found guilty if they didn't have proof?  That's what I want to know.  Why was I found guilty?  She's here.  She's present.

They can—they can ask her.  They already asked her several times at the prelim and at the trial.  She says she told the truth.  What good is it for her to come here to swear to tell the truth and then they don't believe her?  Why did they swear to tell the truth if they're not believed?  I want to know why I was found guilty if the D.A. did not have proof.  He didn't show proof that would generate the sentence that they want to give me."

After the court asked appellant if he wanted to say anything further, appellant replied that his wife wanted to address the court.  After Jane's mother addressed the court, defense counsel stated that he understood his client's frustration given the amount of prison time he was facing.  Counsel stated that after the trial his client had thanked him for his trial work.  Appellant asserted that counsel was lying.  The court asked defense counsel to continue.  Defense counsel stated that he did not blame appellant for "feeling sour about the process" because he was facing an "enormous amount of time." Counsel hoped that the court would understand how much of what appellant was saying was caused by "fear."  Appellant asked if he could say something.  The court told him, to "[h]old on," and allowed defense counsel to continue.  Counsel thanked the court for its "time and trouble" and "patience and time."  The court then turned to appellant's request and said, "If all you're going to do is attack your lawyer, no, sir.  Do you have something additional you want to say?"

Appellant stated that he was "not afraid, because [he] never committed a crime like my attorney is saying.  I—I struggled against my attorney and I struggled against the D.A. in this case.  This attorney did not help me at all and I told it to him to his face.  He never help [sic] me at all."  The court told appellant that he was repeating himself.  Appellant replied that he had "wanted to get a different attorney" and he "was denied that right to get a different attorney."  At no time did appellant explicitly request a new attorney for the sentencing hearing.

As can be seen, appellant said that he wanted a new attorney for trial, but never expressly or by implication said that he wanted a new attorney for the sentencing hearing.  However, relying on *People v. Lara* (2001) 86 Cal. App. 4th 139, 158, appellant argues that the trial court's duty to conduct a *Marsden* inquiry arises once a defendant asserts directly or by implication that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.

As we shall explain, we are not persuaded that the court was required to conduct a *Marsden* inquiry under the facts of this case.  In essence, appellant's complaint about his attorney was that he had not received effective assistance throughout his trial.

The need for a hearing under *Marsden* arises "[w]hen a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation."  (*People v. Richardson* (2009) 171 Cal. App. 4th 479, 484.)  A request for substitution of appointed counsel can be made both before and after trial.  "[T]he standard expressed in *Marsden* and its progeny applies

equally preconviction and postconviction."  (*People v. Smith* (1993) 6 Cal. 4th 684, 694.)

However, in *People v. Sanchez* (2011) 53 Cal. 4th 80 (*Sanchez*), the Supreme Court addressed the common practice of appointing "conflict" counsel when a *Marsden* request is made.  In the course of its decision, the court reiterated that a *Marsden* hearing is required only when "there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.'"  (*Id.* at pp. 89-90.)[FN 21] In a footnote, the court expressly disapproved a series of cases decided by the appellate court to the extent they "incorrectly implied that a *Marsden* motion can be triggered with something less than a clear indication by a defendant" or his counsel that the defendant 'wants a substitute attorney.'"  (*Id.* at p. 90, fn. 3.)   In these disapproved cases, the court had implicitly, if not explicitly, held that a defendant's expressed desire to make a new trial motion or motion to withdraw a plea on the basis of claimed ineffective assistance of counsel, without more, should be treated as triggering *Marsden* hearing requirements.  (E.g., *People v. Mejía* (2008) 159 Cal. App. 4th 1081, 1086 [although defendant made no request for substitute or even conflict counsel, court nevertheless concluded he made a *Marsden* motion because he instructed his counsel to move for a new trial largely on the basis of his counsel's performance at trial and that his counsel so informed the trial court].)

[FN 21:]  Specifically, the *Sanchez* court stated, "[A] trial court is obligated to conduct a *Marsden* hearing on whether to discharge counsel for all purposes and appoint new counsel when a criminal defendant indicates after conviction a desire to withdraw his plea on the ground that his current counsel provided ineffective assistance," but "only when there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.'  [Citation.]"  (*Sanchez*, at pp. 89-90.)

No duty under *Marsden* to inquire into appellant's claim of ineffective assistance of counsel arose here because appellant never gave a "clear indication" that he wanted to replace his appointed counsel at the sentencing hearing.  On the contrary, there was no suggestion appellant wanted a new attorney at that time.   His complaints were addressed to what had happened during the trial and his desire at the first *Marsden* hearing to have new counsel appointed.  In essence, the relief appellant sought in connection with his claim of ineffective assistance was a new trial or an acquittal.  Appellant may have refrained from seeking new counsel because, the motion having been made at a sentencing hearing, counsel's representation was nearly at an end.  Whatever the reason may be, however, appellant's failure to request substitute counsel, or even to suggest he desired a new attorney for the sentencing hearing, rendered *Marsden* inapposite.

Finally, even if we assumed for the sake of argument that the court erred in not conducting a *Marsden* inquiry, *Marsden* does not establish a rule of per se reversible error.  (*People v. Chavez* (1980) 26 Cal. 3d 334, 348-349.)  Appellant must show "either that his *Marsden* motion would have been granted had it been heard, or that

1    a more favorable result would have been achieved had the motion in fact been granted." (*People v. Washington* (1994) 27 Cal. App. 4th

2    940, 944.)   The failure to rule on the motion did not affect appellant's trial in any way.  The motion was made only after he had

3    been convicted.  The basis for such a motion at such a time could have been only that his attorney had acted incompetently at trial.

4    Appellant made no suggestion that his attorney would not represent him competently during the sentencing hearing.  The fact that no

5    *Marsden* motion was entertained does not preclude appellant from attacking the competency of his attorney.  Indeed, we have reviewed

6    counsel's actions under the standards stated in *People v. Babbitt* (1988) 45 Cal. 3d 660, 707 (*Babbitt* ),[FN 22] and conclude that no

7    grounds for claiming ineffective assistance of counsel exist. Appellant was ably and aggressively represented by his appointed

8    counsel and the evidence against him was nothing less than overwhelming.  The fact that appellant admitted that he had a sexual

9    relationship with Jane completely undermined Jane's recantation. We cannot see how the appointment of a different attorney at the

10   sentencing hearing would have gained appellant a new trial, or could have had any effect on the sentence imposed.

11   [FN 22:]  In *Babbitt*, the court noted that "[t]he burden of proving ineffective assistance of counsel is on the defendant.  [Citation.]  To

12   establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell

13   below an objective standard of reasonableness under prevailing professional norms;  and (2) counsel's deficient representation

14   subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been

15   more favorable." (*Babbitt, supra*, 45 Cal. 3d at p. 707.)

16   *Cabrera*, 2013 WL 5348082, *15-18 (footnotes in original).

17             **2.**      **Applicable Law**

18        The Sixth Amendment grants criminal defendants who can afford to retain counsel a

19   qualified right to hire counsel of their choice. *Wheat v. United States*, 486 U.S. 153, 159, 164

20   (1988).  However, a criminal defendant who cannot afford to retain counsel has no right to counsel

21   of his own choosing.  *Wheat*, 486 U.S. at 159.  Nor is he entitled to an attorney who likes and feels

22   comfortable with him. *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991).  The Sixth

23   Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between

24   an accused and his counsel.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).

25        The denial of a motion to substitute counsel may implicate a defendant's Sixth

26   Amendment right to counsel and be properly considered on federal habeas review.  *Bland v. Cal.*

27   *Dep't of Corr.*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*,

28   218 F.3d 1017 (9th Cir. 2000) (en banc); *see also Daniels v. Woodford*, 428 F.3d 1181, 1197-98

United States District Court
Northern District of California

33

(9th Cir. 2005) (noting that test for determining whether court should have granted substitution motion is same as test for determining whether an irreconcilable conflict existed). The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel in a *Marsden* motion, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. *Bland*, 20 F.3d at 1475-76; *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990). The inquiry need only be as comprehensive as the circumstances reasonably would permit, however. *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry was not necessary).

Sometimes the state court fails to rule on a *Marsden* motion. If the state court fails to rule on the motion, the defendant's failure to reassert the *Marsden* motion is not a waiver of the Sixth Amendment claim if the defendant does not know that the trial court has erroneously failed to rule on the motion. *Schell*, 218 F.3d at 1023 (defendant did not waive Sixth Amendment claim because trial counsel misled him to believe the motion to substitute counsel had been denied rather than forgotten). But regardless of whether the state court failed to rule on the motion to substitute counsel or denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. *Id.* at 1024-25 (overruling earlier circuit precedent that had stated that habeas court's inquiry was whether the state court's denial of the motion was an abuse of discretion). That is, the habeas court considers whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Id.* at 1026.

### 3.    Analysis

As explained above, the state appellate court rejected this claim in part because it determined that "[n]o duty under *Marsden* to inquire into appellant's claim of ineffective assistance of counsel arose here because appellant never gave a 'clear indication' that he wanted to replace his appointed counsel at the sentencing hearing." *Cabrera*, 2013 WL 5348082, *18. Respondent argues that the state appellate court's determination that Petitioner did not in fact

United States District Court
Northern District of California

34

1   request substitution of counsel at sentencing is a factual finding that is presumed correct and has

2   not been rebutted.  Dkt. 14-1 at 42 (citing 28 U.S.C. § 2254(e)(1)).  Respondent further argues that

3   "[i]t follows that the trial court was not required to hold a formal *Marsden* hearing at that point."

4   *Id.*  However, the Court disagrees.  As explained above, regardless of whether the trial court failed

5   to hold a *Marsden* hearing or rule on Petitioner's purported motion to substitute counsel, the

6   *ultimate inquiry* in a federal habeas proceeding is whether Petitioner's Sixth Amendment right to

7   counsel was violated.  *See Schell*, 218 F.3d at 1023.  Therefore, this Court must instead consider

8   whether the trial court's failure to rule on the *Marsden* motion "actually violated [Petitioner's]

9   constitutional rights . . . ."  *Id.* at 1026.

10        The record shows that prior to sentencing, Petitioner complained about trial counsel's

11   performance but he did not ask for new counsel.  10RT 728-38.  Petitioner said he was "denied

12   th[e] right to get a different attorney" for trial, and complained about his trial counsel's

13   performance at the trial, but he did not ask for a new attorney for the sentencing hearing.  10RT

14   728-38.  When Petitioner was asked by the sentencing judge if he wanted to say anything besides

15   attack his trial counsel's performance at the trial, Petitioner repeated himself.  10RT 734-735.

16   Also, the record shows that trial counsel indicated that prior to the verdict being rendered,

17   Petitioner "shook [counsel's] hand, [and] he said he was very happy with [counsel's] work, and he

18   thanked [counsel] with a firm handshake saying he was very pleased with the trial work that he

19   had seen."  10RT 733.  Thus it is evident that Petitioner waited until the jury returned a guilty

20   verdict before he complained about his trial counsel's representation.  10RT 733-734.  The record

21   also reflects that the sentencing judge allowed Petitioner to express his concerns about his trial

22   counsel multiple times.  10RT 728-38.  Prior to handing down Petitioner's sentence, the

23   sentencing judge reflected on Petitioner's concerns, which resulted in the following conversation

24   between the judge and Petitioner:

25               The Court: Let me explain a couple of things.  Mr. Cabrera, you had
               the benefit of a trial by a jury of 12 citizens from the community,

26               aggressively prosecuted by Mr. Ozgur and aggressively defended by
               Mr. Rios.  You will disagree with that, but I just don't know what

27               your expectations were.  You outlined a bunch of motions that you
               think should be brought, none of which would have benefitted you,

28               none of which my understanding of the record –

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    [Petitioner]: But he didn't –

2    The Court: – would have been granted.

3    [Petitioner]: But he didn't bring them.

4    The Court: You do not bring motions that are not legally valid and
appropriate.  There was nothing to suppress.  There were no counts
5    to be dismissed pursuant to 995.  There was no 1118.1 motion to be
brought.  There was no legal basis for them.  In the absence of a
6    legal basis for them, those motions can't be brought.

7           Your lawyer has to do a very difficult job, which is to give
you advice as to what is best for you to do.  And we've discussed
8    this previously.  And ultimately certain decisions are yours.  Your
decision was to have a trial, which is your absolute right, and you're
9    not going to be punished for exercising your right to a trial.  And a
jury of 12 citizens listened to all the evidence.  They listened to the
10   statements that [Jane] made at the time of these events, and they
listened to her testimony in court.  And they did not belief [sic] her
11   testimony in court.  And I don't know what pressure she has been
under or not been under.  But in deciding whether she was telling
12   the truth or not telling the truth, I suspect they were tremendously
influenced by your statement made to the police where you
13   acknowledged having a sexual relationship with her when she was
under age[d], which she says didn't happen but you said did.  And I
14   suspect that that played a large influential part in the jury's
determination as to whether the statements she made at the time of
15   the events were true or whether he statements in trial were true.
That was the evidence, the videos the jury watched.  And the jury
16   was satisfied beyond a reasonable doubt that she was not being
truthful in court and that her statements made at the time of the
17   event persuaded the jury beyond a reasonable doubt that the charges
were true.  And the jury therefore, found you guilty.  That is legally
18   significant evidence.  And that is legally sufficient evidence.  It puts
you in a very difficult position.  It puts your attorney in an even
19   more difficult position.

20          Other than the fact that she was telling the telling the truth at
trial, there apparently was no other evidence to present.  I don't
21   know what more you expected Mr. Rios to do.  He aggressively
protected your interests within the framework of what you gave him.
22   He aggressively presented your case.  The jury rejected it.  The jury
found you guilty, and for that you must be punished.  And the Court
23   must exercise its limited discretion in that regard in determining the
appropriate punishment.  Only you know what happened and what
24   [Jane] happened [sic].  In your matter, sir, –

25   [Petitioner]: Can I say something?

26   The Court: No, I don't think there's anything more to say, sir.

27   10RT 736-738 (brackets added).  The sentencing judge then sentenced Petitioner to a determinate

28   prison term of 54 years and a consecutive indeterminate term of 30 years to life in prison.  2CT

36

1    391-396.

2         As evident from the record, Petitioner voiced a substantial complaint about his trial

3    counsel in what he contends was a *Marsden* motion, and the sentencing judge should have then

4    made a thorough inquiry into the reasons for the petitioner's dissatisfaction.  *See Bland*, 20 F.3d at

5    1475-76; *Robinson*, 913 F.2d at 716.  As explained above, the inquiry need only be as

6    comprehensive as the circumstances reasonably would permit, and because Petitioner only raised

7    his complaints at sentencing, the record demonstrates that an extensive inquiry was not necessary.

8    *See King*, 977 F.2d at 1357.  In any event, as noted by the sentencing judge, Petitioner was

9    aggressively represented by "an extremely experienced attorney."  10RT 735.  Also, again as

10   noted by the sentencing judge in the portion quoted above, the jury listened to all of the evidence,

11   including Jane's accusations and recantation, and decided it did not believe her recantation.  10RT

12   737.  Finally, the sentencing judge noted that the jury was likely "tremendously influenced" by

13   Petitioner's acknowledgment that he had a sexual relationship with Jane, albeit allegedly only on

14   one occasion.  10RT 737.  Petitioner has not demonstrated ineffective representation of counsel in

15   the context of this claim.  Indeed, by the time Petitioner raised his *Marsden* motion, the trial had

16   concluded and trial counsel's only role was to represent Petitioner at sentencing.  The state

17   appellate court reviewed trial counsel's actions and reasonably determined that "no grounds for

18   claiming ineffective assistance of counsel exist[ed]."  *Cabrera*, 2013 WL 5348082, *18.  The state

19   appellate court also reasonably concluded that the appointment of a different attorney at the

20   sentencing hearing would neither have gained Petitioner a new trial, nor would it have had any

21   effect on the sentence imposed.  *Id.*  The record supports the state appellate court's ultimate

22   rejection of Petitioner's Sixth Amendment claim because there is no evidence that "the conflict

23   between [petitioner] and his attorney had become so great that it resulted in a total lack of

24   communication or other significant impediment that resulted in turn in an attorney-client

25   relationship that fell short of that required by the Sixth Amendment."  *Schell*, 218 F.3d at 1026.

26   Instead, as the sentencing judge found, Petitioner's complaints about counsel merely focused on

27   Petitioner's disagreements with counsel's tactical decisions and did not indicate a significant

28   breakdown in the attorney-client relationship.  This is not enough to establish an irreconcilable

United States District Court
Northern District of California

37

conflict resulting in the constructive denial of assistance of counsel.  *See, e.g., Stenson v. Lambert*, 504 F.3d 873, 886-87 (9th Cir. 2007) (no irreconcilable conflict where defense counsel refused to pursue defendant's suggested trial strategy that counsel did not believe would succeed, and defendant and second-chair attorney were communicating with each other).  Nor is Petitioner's mere speculation that his preferred tactical decisions would have fared better than trial counsel's enough to establish that he was prejudiced by his conflict with counsel.  *See Strickland v. Washington*, 466 U.S. 668, 693 (1984) (ineffectiveness claims require that petitioner affirmatively prove prejudice).

As such, the state appellate court's rejection of Petitioner's claim—that the trial court's failure to hold a *Marsden* hearing amounted to a denial of his Sixth Amendment right to counsel—was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to habeas relief on this claim, and it is DENIED.

### G.     Sentencing Claim

#### 1.     Background

Petitioner contends that the trial court erred by imposing consecutive indeterminate sentences on counts 1 (aggravated sexual assault based on rape) and 3 (oral copulation ).  Dkt. 9 at 72.  Specifically, Petitioner argues that the evidence failed to establish that the underlying rape and oral copulation occurred on separate occasions.  *Id.*  Moreover, Petitioner argues that although the trial court stated it would exercise its discretion to impose consecutive sentences, that court's stated reasons for so doing were erroneous.  *Id.*  At sentencing, the trial court stated that it was imposing mandatory full-term consecutive sentences pursuant to California Penal Code § 667.6(d).  However, the trial court said that even if it had discretion under section 667.6(c), it would still impose consecutive sentences because "each count alleges separate events at separate days."  10RT 738.

The state appellate court rejected this claims as follows:

> The statute under which Petitioner was convicted in counts one and three—section 269 states, in pertinent part, "(c)  The court shall impose a consecutive sentence for each offense that results in a

conviction under this section if the crimes involve . . . the same victim on separate occasions, as defined in subdivision (d) of Section 667.6."

In turn, section 667.6 subdivision (d) provides, "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Petitioner argues that Jane testified that each time Petitioner engaged in sexual intercourse with her, first he would lick and rub her vagina. Petitioner asserts that since count one charged rape and count three charged oral copulation as the underlying crimes the jury could have based its verdicts on acts that occurred on the same occasion. Relying on this court's opinion in *People v. Coelho* (2001) 89 Cal. App. 4th 861 (*Coelho*), Petitioner contends that because it cannot be determined beyond a reasonable doubt that the jury's verdicts on these counts were based on acts that occurred on separate occasions, full term consecutive sentences were not mandatory.[FN 24]

[FN 24:] In *Coelho, supra*, 89 Cal. App. 4th 861, the defendant was convicted of multiple sex crimes as to which the trial court could have imposed concurrent sentences, discretionary consecutive sentences (§ 667.6, subd. (c)), or mandatory consecutive sentences (§ 667.6, subd. (d)), depending upon which of the multiple acts the convictions were based. Faced with an ambiguous verdict, this court considered the effect of *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, which held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. We recognized that "a defendant's federal constitutional right to a jury trial requires the trial court to accept the jury's determination concerning the factual bases for its verdicts." (*Coelho, supra*, at p. 878.) We concluded that where it cannot be determined beyond a reasonable doubt upon which unlawful acts among the many the jury based its verdicts, the trial court should assume, for the purpose of sentencing, the factual bases that would provide the most discretion. (*Id*. at p. 885.) This court concluded that the provision of the Three Strikes law that requires a trial court to impose a consecutive Three Strikes sentence for each current offense of which a defendant is convicted that is "not committed on the same occasion, and not arising from the same set of operative facts" as another current offense (see §§ 667, subd. (c)(6), (7), 1170.12, subd. (a)(6), (7)) should be interpreted to require a trial court to impose consecutive sentences only where the jury expressly found (or, in light of the record, must have found) beyond a reasonable doubt that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts. (*Coelho, supra*, 89

Cal. App. 4th at pp. 874-884.)  In the absence of such an explicit or implied jury finding, we held, a trial court is not required to impose consecutive Three Strike sentences, and must exercise its ordinary discretion in determining whether to impose consecutive or concurrent sentences.  (*Id*. at pp. 884-886.)

> *Coelho* was based on our recognition that "a defendant's federal constitutional right to a jury trial requires the trial court to accept the jury's determination concerning the factual bases for its verdicts."  (*Coelho, supra*, at p. 878.)  We concluded that where it cannot be determined beyond a reasonable doubt upon which unlawful acts among many the jury based its verdicts, the trial court should assume, for the purpose of sentencing, the factual bases that would provide the most discretion.  (*Id*. at p. 885.)

> Nevertheless, our decision in *Coelho* preceded the United States Supreme Court decision in *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*), where the high court held that *Apprendi* does not apply to factual findings that bear on the question whether multiple sentences are to be imposed consecutively or concurrently.  (*Id*. at pp. 163-164.)  In *Ice*, the trial judge made findings that two of the six crimes of which the defendant was convicted constituted separate incidents within the meaning of state sentencing law.  As a result, the trial judge exercised his discretion to impose consecutive sentences for the two crimes.  (*Id*. at pp. 164-166.)  The defendant argued that, under the rationale of *Apprendi*, and its progeny, the finding of fact necessary to impose a consecutive sentence must be made by the jury.  The Supreme Court disagreed and held that the Sixth Amendment does not prohibit delegating to trial judges, rather than juries, the finding of facts necessary to support the imposition of consecutive, rather than concurrent, sentences.  (*Id*. at pp. 166-169.)  However, because the issue is not squarely presented here, we express no view on the validity of our holding in *Coelho* in light of the high court's subsequent decision in *Ice*.

We are not convinced that *Coelho* is applicable to this case because even if the jury had found that the forcible oral copulation and the forcible rape occurred just as Jane described to the police—i.e. in one event, it would not have precluded the trial court from making the finding that the crimes involved the same victim on separate occasions.  As we shall explain, where forcible sex crimes are concerned, the term "separate occasions" is something of a term of art.[FN 25]

[FN 25:] "The express legislative purpose for including the explication of the phrase 'separate occasions' was 'to abrogate the decision in [*People v. Craft* (1986) 41 Cal. 3d 554 . . . ], and to establish an objective test for determining whether sex crimes against a single victim occurred on separate occasions.'  (Stats. 1986, ch. 1431, § 2, p. 5129.)  *Craft* had construed Penal Code section 667.6, subdivision (d) 'in a narrow manner,' as applying only when, between sexual assaults on a single victim, a defendant

temporarily lost or abandoned the opportunity to continue his attack. (*Craft, supra*, 41 Cal.3d at p. 561 . . . .)  The legislative history reveals the aim to provide 'a broader, less stringent standard to prove that multiple sex crimes occurred against the same victim on separate occasions.'  (Cal. Youth and Adult Correctional Agency, Enrolled Bill Rep. on Assem. Bill No. 2295 (1985-1986 Reg. Sess.) Sept. 1986, p. 2.)"  (*People v. Jones* (2001) 25 Cal. 4th 98, 104, fn. 2.)

As section 667, subdivision (d) tells us, "the duration of time between the acts and the retention of the opportunity to attack again are not themselves determinative.  [Citation.]"  (*People v. Plaza* (1995) 41 Cal. App. 4th 377, 385.)

Furthermore, "[a] finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior.'  [Citation.]"  (*People v. King* (2010) 183 Cal. App. 4th 1281, 1325 (*King*).)

As one court has explained with respect for forcible sex crimes, "[a] violent sexual assault cannot and should not be considered in the same light as sexual acts shared between willing participants.  Consensual sex may include times when the participants go back and forth between varied sex acts, which they consider to be one sexual encounter.  By contrast, a forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter.  Such a sexual assault consisting of multiple types of sex acts committed against the victim is not motivated by sexual pleasure.  Instead, it is frequently intended to degrade the victim.  Sexual acts, such as those committed by defendant, are the antithesis of a consensual sexual encounter and should not be viewed the same way.  Therefore, at sentencing a trial court could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions."  (*People v. Irvin* (1996) 43 Cal. App. 4th 1063, 1071.)

In *King, supra*, 183 Cal. App. 4th 1281, consecutive sentences for a series of sexual assaults during one relatively brief incident were not an abuse of discretion, given, among other things, the defendant's "position of trust and authority . . . and the fact that he had an opportunity to stop—and chose not to . . . ." (*Id.* at p. 1326.)  Here, Jane described a routine that occurred ever time Petitioner raped her, which involved taking off her clothes and touching her breasts and vagina, making her lie down and then taking off his clothes and getting on top of her before he placed his penis in her vagina.  Here, the trial court could reasonably have concluded that between the oral copulation and the rape Petitioner had "a reasonable opportunity to reflect upon his or her actions" while removing his clothing and "nevertheless resumed sexually assaultive behavior."  By statute, the trial court at sentencing is empowered to make the determination whether multiple sexual offenses occurred on separate occasions for purposes of imposing full consecutive terms.  [Citations.]"  (*People v. Groves* (2003) 107 Cal. App. 4th 1227, 1230.)

The premise of Petitioner's argument that consecutive sentences were not mandatory is based on his assertion that the evidence failed to establish that the underlying rape and oral copulation occurred on separate occasions.  As we have just established, such is not the case.  Accordingly, we reject Petitioner's contention that the trial court erred by imposing consecutive sentences.[FN 26]

[FN 26:]  Petitioner acknowledges that his counsel failed to object below when the court imposed consecutive sentences.  He submits that no objection was necessary, but if it was necessary to preserve the issue for review, he argues that his counsel was ineffective. Since we have addressed the issue, we need not address Petitioner's ineffective assistance of counsel claim.

*Cabrera*, 2013 WL 5348082, *19-21 (footnotes in original).

### 2.    Applicable Law

A violation of state law, in this case a state sentencing law, is not a valid basis for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  However, in limited circumstances, the misapplication of a state sentencing law may violate federal due process.  *Richmond v. Lewis*, 506 U.S. 40, 50 (1992).  Under such circumstances, the constitutional question "is whether [the alleged error] is so arbitrary or capricious as to constitute an independent due process" violation. *Ibid.*  "Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."  *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994).

### 3.    Analysis

Petitioner's sentencing claim fails because he has failed to show any misapplication of state law.  As the state appellate court held, no state law error has been shown here because Petitioner's sentence was authorized by state law.  This Court must defer to the state appellate court's interpretation and application of California law concerning the propriety of Petitioner's sentence under California law.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Missouri v. Hunter*, 459 U.S. 359, 368 (1983).  As the state courts resolved this state law issue against Petitioner, this federal court may not disrupt that ruling.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Mullaney*, 421 U.S. at 691 ("state courts are the ultimate expositors of state law").  Accordingly, because the state appellate court's determination was neither contrary to, nor an unreasonable application of established Supreme Court precedent, Petitioner's claim based upon a

misapplication of state sentencing law fails.  Therefore, this claim is DENIED.

### H.    IAC Claims

#### 1.    Background

Petitioner contends he was denied his right to effective assistance of counsel because trial counsel did not (1) attempt to suppress his statements in the interrogation, or (2) present expert testimony demonstrating that petitioner does not have the psychological character of a person who would commit the charged offenses.  Dkt. 9 at 76-84.  Petitioner also argues that the cumulative errors of trial counsel resulted in prejudice.  *Id.* at 84.

#### 2.    Applicable Law

An IAC claim under the Sixth Amendment is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the first prong, the defendant must show "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  To satisfy the second prong under *Strickland*, the petitioner must establish that he was prejudiced by counsel's substandard performance.  *See Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 694).

Under AEDPA, a federal court is not to exercise its independent judgment in assessing whether the state court decision applied the *Strickland* standard correctly; rather, the petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner.  *Bell v. Cone*, 535 U.S. 685, 699 (2002); *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential.").  The Supreme Court has specifically warned that: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under section 2254(d).  When section 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether *there is any*

1    *reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Harrington v.*

2    *Richter*, 562 U.S. 86, 105 (2011) (emphasis added).

3          **3.**      **Analysis**

4          **a.**      **Failure to File a Motion to Suppress**

5          Petitioner claims that trial counsel was ineffective for failing to move to suppress his

6    confession because Petitioner asked that the tape recorder be turned off during the interrogation

7    and was promised that his statements would be kept "in confidence." Dkt. 9 at 76.  In essence,

8    Petitioner contends that his request to turn off the tape recorder in order to speak with the officers

9    "like men and not 'like an official'" constituted an invocation of his *Miranda* rights against self-

10   incrimination. *Id.* at 76-78.  Thus, Petitioner argues that trial counsel was ineffective in failing to

11   challenge the admissibility of Petitioner's involuntary confession. *Id.* at 78

12         Because there is no reasoned opinion relating to this IAC claim, the Court refers to the

13   following factual background given by Petitioner, which Respondent has not challenged and the

14   Court has verified to match the record:

15         . . . .  The request to turn off the recorder occurred well into

16   the interrogations, at about 38 minutes into the recording.  (*See* People's 5, 36:00-38:20.)  Prior to this time, petitioner's statements

17   were that he had taken off his clothes and that [Jane] had done the same, and that they have intended to "have relations," but that

18   ultimately nothing happened.  (2CT 266.)  He had continually insisted, in spite of the detectives lies about DNA evidence being

19   recovered from [Jane], that no actual sexual contact had occurred. (*See e.g.*, 2CT 265 ["nothing happened"], 261 ["nothing happened"],

20   266 ["nothing happening that I know of"].)

21         Detective Del Moral then told Petitioner that he wanted to "speak in confidence here and talk with Petitioner 'like men.'"

22   (2CT 266; People's 5 35:55.)  Petitioner pointed to the tape recorded and said, "YOU'RE RECORDING EVERYTHING?"  (2CT 266;

23   People's 5, 36:00.)  The detective explained that the recorder could be turned off.  (2CT 266-267.)

24         Petitioner  initially  replied  that  he  would  feel  more

25   comfortable with the recorded turned off but that he had nothing to hide.  (2CT 267.)  The recorder was left run[n]ing.  (*See* 2CT 267.)

26   About a minute later, however, Petitioner asked that the recorder be turned off so that they could talk "not like an official like you say"

27   but rather "like men."  (2CT 268.)  As soon as the recorder was "turned off" Petitioner began to describe, in detail; an incident that

28   he characterized as a consensual sexual encounter with [Jane]."

Dkt. 9 at 77 (brackets added).

In support of his claim, Petitioner relies on *People v. Nicholas*, 112 Cal. App. 3d 249 (1980), which he claims held that a suspect's refusal to permit a tape-recorded interview constitutes an invocation of his right to remain silent.  The defendant in *Nicholas* asked that the tape recorder be turned off and that two of the three officers interrogating him (after his arrest for murder and robbery) leave the room so that he could speak with one officer alone.  112 Cal. App. 3d at 263.  The court held that the defendant's requests to turn off the tape recorder and to speak with the one office alone, together with his request for assurances of complete privacy, amounted to an invocation of the privilege.  *Id.* at 268.  Without a knowing and intelligent waiver of the defendant's rights, the court found that it was improper to admit the confession given to the sole officer.  *Id.*  In explaining its rationale the court wrote:

> It is apparent that when the police interview a suspect, they must skate a fine line.  They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been the victims of foul play.  They are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.

*Id.* at 264-65 (citation omitted).

Here, the record shows that Petitioner's appellate counsel asked his trial counsel about the failure to file a suppression motion.  Dkt. 9-1 at 58.  In response, trial counsel stated as follows:

> I am familiar with *People v. Nicholas*.  However, I did not raise the argument in [Petitioner's] case because the facts in [Petitioner's] case did not give me a viable argument that my client had invoked *Miranda*.  My client clearly waived *Miranda*.  The police did not promise him that the room was not otherwise bugged.  Mr. Cabrera assumed incorrectly that . . . the only recording device was the visible tape recorder.

> Mr. Cabrera's later statements to the police did not suggest to me that he was promised anything other than that a tape recorder would be shut off.  I have had numerous clients ask to have a tape recorder sitting in front of them, shut off.  Just asking to have it shut off and watching the police turn it off is not enough to invoke *Miranda*.  Or that is how I interpret the law.  If I am wrong then I stand corrected.

*Id.* (brackets added).

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Upon independent review, the Court finds that the state supreme court's summary denial of

2     this claim was not objectively unreasonable.  "[I]n order to show prejudice when a suppression

3     issue provides the basis for an ineffectiveness claim, the petitioner must show that he would have

4     prevailed on the suppression motion, and that there is a reasonable probability that the successful

5     motion would have affected the outcome." *Bailey v. Newland*, 263 F.3d 1022, 1029 (9th Cir.

6     2001) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).  The voluntariness of a

7     confession is evaluated by reviewing both the police conduct in extracting the statements and the

8     effect of that conduct on the suspect.  *See Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v.*

9     *Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999).  Absent police misconduct causally related to the

10    confession, there is no basis for concluding that a confession was involuntary.  *Colorado v.*

11    *Connelly*, 479 U.S. 157, 167 (1986); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989).

12    "The test is whether, considering the totality of the circumstances, the government obtained the

13    statement by physical or psychological coercion or by improper inducement so that the suspect's

14    will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing

15    *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).

16     In determining whether the defendant's will was overborne by the circumstances

17    surrounding the giving of the confession, the inquiry "takes into consideration . . . both the

18    characteristics of the accused and the details of the interrogation."  *United States v. Preston*, 751

19    F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428, 434

20    (2000)).  More specifically, courts consider the following factors: the age of the accused, his

21    intelligence, the lack of any advice to the accused of his constitutional rights, the length of

22    detention, the repeated and prolonged nature of the questioning, and the use of physical

23    punishment such as the deprivation of food or sleep.  *United States v. Haswood*, 350 F.3d 1024,

24    1027 (9th Cir. 2003).

25     The Supreme Court has made clear that "coercive police activity is a necessary predicate to

26    the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of

27    the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.  But police deception alone does not

28    render a confession involuntary.  *See Ortiz v. Uribe*, 671 F.3d 863, 868 (9th Cir. 2011).

United States District Court
Northern District of California

1   Here, Petitioner's statements were not involuntary because they were not extracted by

2   threats or violence, obtained by direct or indirect promises, or secured by improper influence.  Nor

3   were they coerced by physical intimidation or psychological pressure.  The record instead showed

4   that Petitioner seemed calm and alert during the questioning, and indicated that he "didn't have

5   anything to hide."  2CT 267.  To be sure, it is undisputed that the officers misled Petitioner on the

6   existence of DNA evidence from the victim.  However, this sort of deception by itself is

7   compatible with lawful police behavior because it is not likely to result in an involuntary

8   confession.  *See Ortiz*, 671 F.3d at 868 (finding that a detective's statements during polygraph

9   preparation that indicated she was not a law enforcement officer, where surrounding

10  circumstances suggested she was acting at the request of detectives, were not coercive).  Finally,

11  Petitioner's case is distinguishable from *Nicholas* because Petitioner only requested that the

12  officers turn the tape recorder off.  The record shows that it took a few minutes before Petitioner

13  confirmed that he actually wanted the officers to turn off the tape recorder because, as mentioned

14  above, he "didn't have anything to hide."  2CT 266-267.  At the start of the interrogation,

15  Petitioner had waived his *Miranda* rights.  2CT 238-240.  Nowhere in the interrogation did

16  Petitioner later specifically ask to invoke his right to remain silent.  *See* 2CT 241-290.  Further,

17  unlike in *Nicholas*, Petitioner here continued to speak with *both* officers after the tape recorder

18  was turned off and he did not ask for one officer to step away.  *See* 2CT 268-269.  In addition,

19  Petitioner did not specifically request for assurances of complete privacy, as the defendant in

20  *Nicholas* did.  Petitioner may have requested to speak with the officers "like men," 2CT 268, but

21  he did not specifically request that his statements would not be used against him.  Petitioner did

22  not ask for any assurances that there were no other recording devices in the room, and the officers

23  did not promise Petitioner that the room was not otherwise bugged.  As such, Petitioner assumed

24  incorrectly that the only recording device was the visible tape recorder, and there is nothing in the

25  record showing that the officers promised him anything other than that the tape recorder would be

26  turned off.  Because Petitioner has not offered any evidence to show that the officers engaged in

27  misconduct during his interrogation and his request to turn off the tape recorder alone did not

28  amount to an invocation of his right to remain silent, then he necessarily has not shown that a

47

1    motion to suppress would have been meritorious.  Trial counsel's failure to make a motion that has

2    not been shown to have merit cannot be considered deficient performance under *Strickland*.  *See*

3    *Kimmelman*, 477 U.S. at 375.

4        In any event, even without Petitioner's admission that he had once had a consensual sexual

5    encounter with Jane, the evidence of guilt as to the years of sexual molestation was strong.  Based

6    on Jane's initial accusations made to the police, the jury was presented with the following

7    evidence: that Petitioner had touched Jane in a sexual manner every year of her life between the

8    ages of seven and seventeen, 4RT 314-320; that Jane never consented to or initiated sexual

9    intercourse with Petitioner, 4RT 320-321; and that sometimes Petitioner forced her, and other

10   times she went along with it for fear of getting hit, 4RT 320-321; 5RT 357-358, 360-362, 417.

11   Although Jane recanted her accusations of sexual abuse at the trial, before the trial she gave the

12   officers detailed statements regarding ten years of sexual abuse.   5RT 410-418, 6RT 484-489.

13   Also, a pretext phone call was made to Petitioner and Jane told him that she thought she might be

14   pregnant.  5RT 420-422.  While Petitioner did not admit having a sexual relationship with Jane

15   during the recorded call, he also did not say that he could not have gotten her pregnant, and

16   instead, Petitioner tried to change the subject.  5RT 421-422.  The jury evidently rejected

17   Petitioner's claim of innocence even though Jane recanted her accusations of sexual abuse at the

18   trial.  Thus, it is not reasonably probable that, but for trial counsel's failure to file a suppression

19   motion, the result of the proceeding would have been different.  Because Petitioner was not

20   prejudiced by trial counsel's tactical decision not to file a suppression motion, the state supreme

21   court's denial of relief was not unreasonable.

22       Accordingly, the state supreme court's denial of Petitioner's IAC claim on collateral

23   review—based on trial counsel's failure to move to suppress Petitioner's confession—was not an

24   objectively unreasonable application of the *Strickland* standard.  The Court therefore finds that

25   there is a "reasonable argument that counsel satisfied Strickland's deferential standard."

26   *Harrington*, 562 U.S. at 105.  Petitioner's IAC claim on this particular ground is DENIED.

27              **b.    Failure to Present Expert Witness**

28       According to Petitioner, trial counsel was also ineffective for failing to present expert

United States District Court
Northern District of California

testimony demonstrating that Petitioner "does not have the psychological character of a person who would commit the type of sexual acts that were alleged in this case."  Dkt. 9 at 80-84.

The record shows that Petitioner's appellate counsel asked trial counsel about the failure to present this type of expert evidence, as permitted by *People v. Stoll*, 49 Cal.3d 1136 (1989).[9]  Dkt. 9-1 at 57.  Trial counsel specifically "considered using a *Stoll* expert, but decided against hiring one since, in his experience, 'juries are suspicious of "psych" defenses.'"  *Id.*  Trial counsel also opined that "putting on a *Stoll* defense would undercut his attack on the prosecution's [CSAAS] expert."  *Id.*

Again, upon independent review, the Court finds that the state supreme court's summary denial of this claim was not objectively unreasonable.  Strategic decisions by counsel are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  This Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight," but rather should "defer to counsel's sound trial strategy."  *Murtishaw v. Woodward*, 255 F.3d 926, 939 (9th Cir. 2001).  Further, Petitioner's mere speculation that the witness, or in this case the *Stoll* expert, might have given helpful information is not enough to establish ineffective assistance.  *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.23d 1150 (9th Cir. 2001).

Moreover, Petitioner cannot establish prejudice.  To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to petitioner.  *See Alcala v. Woodford*, 334 F.3d 862, 872-873 (9th Cir. 2003).  As explained above, the jury did not believe Petitioner's version of events even after Jane recanted her accusations.  Thus, it is not reasonably probable that the jury would have believed Petitioner's claim of innocence because a paid defense *Stoll* expert, who would have interviewed Petitioner on one occasion three years after the sexual assaults stopped, and could have concluded Petitioner did

---

[9] Under California law, a psychological evaluation which concludes that a defendant does not fit the psychological profile of a child molester is admissible as character evidence tending to show that the defendant did not commit the crime.  *Stoll*, 49 Cal. 3d at 1152.  Such evaluations are commonly referred to as *Stoll* evaluations.

United States District Court
Northern District of California

1    not have the psychological character of the person who would commit the charged offenses.

2    Therefore, the state supreme court's rejection of this IAC claim was not objectively unreasonable.

3    *Cf. Brodit*, 350 F.3d at 992-94 (state court did not unreasonably apply *Strickland* standard in

4    rejecting ineffective assistance claim based on counsel's failure to investigate a *Stoll* evaluation

5    where court credited defense counsel's testimony that he made a tactical decision not to order such

6    a report because he didn't want to risk the prosecution introducing other damaging character

7    evidence.)

8          Accordingly, because trial counsel's decision not to present testimony from a *Stoll* expert

9    was a reasonable tactical decision, the state supreme court's summary rejection on collateral

10   review was not an objectively unreasonable application of the *Strickland* standard.  Petitioner has

11   not established trial counsel's incompetence nor has he shown that the outcome of trial would

12   have been different had counsel presented testimony from a *Stoll* expert.  Thus, the Court finds

13   that there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard."

14   *Harrington*, 562 U.S. at 105.  Petitioner is not entitled to relief on his IAC claim relating to trial

15   counsel's failure to present testimony from a *Stoll* expert.  This claim is DENIED.

16                         **c.      Cumulative Prejudice**

17         The Court finds no merit to Petitioner's argument that the cumulative prejudice of trial

18   counsel's errors resulted in ineffective assistance of counsel.

19         As mentioned above, although no single trial error is sufficiently prejudicial to warrant

20   reversal, the cumulative effect of several errors may still prejudice a defendant so much that his

21   conviction must be overturned.  *See Mancuso*, 292 F.3d at 957.  However, where, as here, there is

22   no single constitutional error existing, nothing can accumulate to the level of a constitutional

23   violation.  *Id.*

24         The Court has found above that in both instances of alleged ineffective performance, trial

25   counsel's performance did not fall below an objective standard of reasonableness.  Based on this

26   record, the Court concludes that Petitioner is not entitled to habeas relief on a claim that he

27   suffered cumulative prejudice from trial counsel's alleged two instances of ineffective assistance.

28         Accordingly, Petitioner is not entitled to habeas relief on this claim, and it is DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

**V.      CERTIFICATE OF APPEALABILITY**

No certificate of appealability is warranted in this case.  For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**VI.     CONCLUSION**

For the reasons outlined above, the Court orders as follows:

1.      All claims from the amended petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.      The Clerk of the Court shall enter judgment, terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated:  June 28, 2016

_____
YVONNE GONZALEZ ROGERS
United States District Judge

51